IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-01192-SKC-TPO

ANA BERRIZBEITIA,

Plaintiff,

v.

BOARD OF TRUSTEES OF COLORADO MESA UNIVERSITY,

Defendant.

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 38]**

---

Plaintiff Ana Berrizbeitia, by and through undersigned counsel, respectfully submits this Response in Opposition to Defendant's Motion for Summary Judgment (ECF No. 38) (the "Motion"). Pursuant to Section C.4.d of the Court's Standing Order for Civil Cases, Plaintiff's separate Statement of Undisputed Material Facts, in the Court's three-column format, is filed contemporaneously herewith, and an editable Word version has been provided to Defendant's counsel.

## INTRODUCTION

For six years, Dr. Ana Berrizbeitia, a Venezuelan-born, Hispanic woman, was by her employer's own account an exemplary tenure-track professor of mathematics. Her supervisor and department head, Dr. Lisa Driskell, rated her "above expectation" or "exceptional" every year, never recommended discipline, and testified that tenure "was our goal." Ex. 2, Driskell Dep. 107:8–18; *id.* 139:20–21. Five months before the

termination, Dr. Driskell and Vice President of Academic Affairs Cher Hendricks signed an evaluation scoring her 500 out of 500 and rating her "Exceptional." Ex. 3, CMU_0295; Ex. 1, Berrizbeitia Dep. 94:11–20.

Then, in July 2024, weeks before Dr. Berrizbeitia was to apply for tenure, a single student hand-delivered three written complaints re-packaging events from 2020–2022 that Dr. Berrizbeitia had herself reported in 2022 and that Dr. Driskell had addressed then with a written development plan and documented improvement. Yet on receiving them Dr. Driskell, whose criticisms of Dr. Berrizbeitia's expressions, tone, and "direct" style had already prompted her to protest that she was being told to "code switch to make white people more comfortable", told the VPAA she could no longer support tenure and would look for "FERPA-like violations" to "support more of a case against" her. Ex. 1, Berrizbeitia Dep. 73:14–74:13, 80:19–81:21.

No one at CMU then asked Dr. Berrizbeitia for her side of the story. Ex. 2, Driskell Dep. 128:10–13. President Marshall, who never spoke with Dr. Driskell, skipped the Handbook's pre-dismissal notice-and-meeting process and fired her on August 8, 2024, for reasons including an unspecified "violation of local, state or federal laws." A male instructor under the same supervisor, with a documented pattern of student complaints, received coaching instead. Ex. 2, Driskell Dep. 135:8–138:23.

On this record a reasonable jury could find that CMU's stated reasons are unworthy of belief and that Dr. Berrizbeitia's race and sex were the real reasons. The Motion should be denied.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to the Court's Standing Order § C.4.d.2, Plaintiff's responses to Defendant's Statement of Undisputed Material Facts, together with Plaintiff's additional statements of material fact ("PSAF"), are set forth in the three-column chart filed contemporaneously herewith.

## STANDARD OF REVIEW

Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence and draw all reasonable inferences in Dr. Berrizbeitia's favor, and may not weigh evidence or make credibility determinations. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986). Because "judgments about intent are best left for trial and are within the province of the jury," summary judgment is rarely appropriate where the record permits competing inferences. *Plotke v. White*, 405 F.3d 1092, 1103–05 (10th Cir. 2005).

## ARGUMENT

### I. Dr. Berrizbeitia readily establishes a prima facie case of race and sex discrimination.

Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the prima facie burden "is not onerous"; it is "de minimis." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 922 (10th Cir. 2001); *Plotke*, 405 F.3d at 1101. Defendant concedes the first two elements. Mot. at 6.

Only the third, circumstances giving rise to an inference of discrimination, is contested, and Defendant's own authority defeats its argument.

In discharge cases the Tenth Circuit often requires only that the plaintiff belonged to a protected class, was qualified for her job, was discharged, and that her position was not eliminated. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000); *Perry v. Woodward*, 199 F.3d 1126, 1138 (10th Cir. 1999). Each is satisfied: six consecutive years of "above expectation" and "exceptional" ratings, a March 2024 evaluation scoring her 500/500 and "Exceptional," and her supervisor's testimony that tenure "was our goal." Ex. 3, CMU_0289–0295; Ex. 2, Driskell Dep. 95:7–22, 100:9–17, 103:8–17, 107:8–18; Ex. 1, Berrizbeitia Dep. 94:11–20. CMU does not contend her line was eliminated.

The record independently satisfies the *Plotke* formulation Defendant invokes, under which an inference of discrimination may arise from "preferential treatment given to employees outside the protected class" and "the timing or sequence of events leading to plaintiff's termination." 405 F.3d at 1101.

First, preferential treatment. As detailed in Section II.B, a male instructor with a "pattern" of student complaints received coaching and an improvement plan rather than termination, and colleagues outside Dr. Berrizbeitia's protected classes engaged in comparable or worse student-boundary conduct without counseling. Ex. 2, Driskell Dep. 135:8–138:23, 142:8–145:9, 143:19–23, 145:12–149:13; Ex. 1, Berrizbeitia Dep. 68:11–25, 69:17–70:13, 82:4–83:14, 84:9–86:24, 90:16–92:21.

Second, timing and sequence. Dr. Berrizbeitia was terminated weeks before her tenure application, on complaints about years-old conduct her supervisor had already addressed and considered resolved. Ex. 2, Driskell Dep. 109:12–19, 114:22–116:14, 119:25–120:6, 106:11–17. Dr. Driskell's first reaction was to ask whether the tenure review could be "delay[ed] . . . by a year." *Id.* 109:12–19. A termination that abruptly reverses a years-long trajectory of praise, on the eve of tenure, on stale and previously resolved allegations is precisely the "timing or sequence" that supports an inference of discrimination. *Plotke*, 405 F.3d at 1101, 1103–05.

Finally, the same supervisor repeatedly targeted culturally rooted aspects of Dr. Berrizbeitia's identity, telling her that her face "would betray" her and that the way she sat was "intimidating", prompting Dr. Berrizbeitia to tell her that her expressiveness and directness are "very much informed by my culture and how I grew up and where I'm from," and that she felt she was being told to "code switch to make white people more comfortable." Ex. 1, Berrizbeitia Dep. 80:1–81:21; Ex. 2, Driskell Dep. 131:7–134:2. This easily clears a de minimis bar.

## II. A reasonable jury could find CMU's proffered reasons pretextual.

A plaintiff shows pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (citation omitted). Pretext may be shown through differential treatment of similarly situated employees, *Kendrick*, 220 F.3d at 1230, through "disturbing

procedural irregularities," *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002), or through an inadequate investigation that fails even to hear the employee's side, *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542–44 (10th Cir. 2014). And once the employer's explanation is disbelieved, the factfinder may infer discrimination from its falsity together with the prima facie case. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000). Here, multiple independent lines of evidence converge.

### A. CMU disregarded its own Handbook process and never sought Dr. Berrizbeitia's side of the story.

CMU's Handbook provides that "[g]enerally," a Notice of Dismissal for Cause "shall not be issued until the President has given the Faculty member notice of potential dismissal and an opportunity to meet with the President." ECF No. 38-2 at CMU_237–239; ECF No. 38-9 ¶ 7. President Marshall admits he skipped those steps. ECF No. 38-6, Marshall Decl. ¶ 12. No one at CMU ever contacted Dr. Berrizbeitia for her version of events before the decision was made. Ex. 2, Driskell Dep. 111:16–20, 128:10–13. Dr. Driskell explained the premise: she "thought that contact would actually be unhelpful." *Id.* 128:22–129:3.

Exhibit 8 shows that premise in operation. On July 31, 2024, eight days before the termination, Dr. Driskell wrote to VPAA Hendricks and Dr. Sunkel that "our next step is to meet with the students to 'gather more information,'" then set out the mechanics of scheduling those interviews around her own travel so they could occur without delay. Ex. 8, CMU_0439–40. What the email never contemplates is speaking with Dr. Berrizbeitia. The plan ran in one direction only.

Far from neutralizing that design, Dr. Driskell's explanation confirms it. She did not claim oversight. She did not claim time pressure. She claimed only that hearing from the accused professor would have made things worse. Ex. 2, Driskell Dep. 128:22–129:3. A jury is entitled to ask: worse for whom? Where an employer treats the accused employee's account not as evidence to be weighed but as an obstacle to be avoided, a factfinder may conclude that the outcome preceded the inquiry. *Smothers*, 740 F.3d at 542–44; *BCI Coca-Cola*, 450 F.3d at 488.

Exhibit 8 also shows what the missing account cost. Under the heading "[a]nother egregious act," Dr. Driskell transmitted to the VPAA a student's secondhand claim that Dr. Berrizbeitia "publicly discussed another student's private health decisions and wished that the student would become ill from Covid-19", forwarded verbatim, unverified, and pre-labeled "egregious." Ex. 8, CMU_0439 (filed under restriction). Its substance reached President Marshall, who raised complaints "as far back as COVID" at the August 8th meeting. Ex. 1, Berrizbeitia Dep. 100:23–101:15. As shown in Section II.C, that accusation is disputed; a single question would have surfaced the conflict. It was never asked.

The Tenth Circuit has repeatedly held that a jury may find pretext where an employer hears the accusers and never hears the accused. In *Smothers*, "[t]hree decision makers personally spoke with" the accusing employee "to hear his allegations . . . . None heard Mr. Smothers' version of the encounter." 740 F.3d at 542–44. As the court explained, "[i]f Solvay's decision makers had allowed Mr. Smothers to respond to Mr. Mahaffey's allegations before they fired him, we could

perhaps accept that Solvay found Mr. Mahaffey's version of events more credible." *Id.* So too here, where the asserted good-faith belief rests entirely on accusers' accounts. See also *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 488 (10th Cir. 2006) (an employer takes "care not to rely exclusively on the say-so of the biased subordinate" by "simply asking an employee for his version of events"). The failure was not harmless: had anyone asked, she would have explained, as she did on August 8th and as set out in Section II.C, that the central accusations are false. Ex. 1, Berrizbeitia Dep. 101:19–103:4, 103:12–104:7.

The procedural irregularities run deeper. President Marshall, the sole decisionmaker, never met or spoke with Dr. Driskell, the accused professor's supervisor of five years, before terminating her, and never asked her for a summary, assessment, or recommendation. Ex. 2, Driskell Dep. 170:16–23, 171:15–172:6. Had he asked, he would have learned that his "highly conscientious" academic leader, Marshall Decl. ¶ 12, had rated Dr. Berrizbeitia exceptional, had addressed the 2022 conduct with a development plan and documented improvement, and that her "first instinct" was coaching, not dismissal. Ex. 2, Driskell Dep. 107:8–18, 119:25–120:6, 106:11–17, 173:11–17. A jury may treat "deviations from normal company procedure" as support for a finding of pretext. *Garrett*, 305 F.3d at 1217–19; see also *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005). Nor was there any investigation to review: asked for her personnel records and "the information pertaining to the investigation," CMU's Human Resources responded that CMU "do[es] not have anything responsive." Ex. 5, BERRIZBEITIA 000269. And

Hendricks, through whom the complaints reached President Marshall, Marshall Decl. ¶¶ 7, 11, had herself signed the "Exceptional," 500/500 evaluation five months earlier. Ex. 3, CMU_0295.

### B. Similarly situated employees outside Plaintiff's protected classes were coached, not fired, for conduct of comparable seriousness.

An employee is similarly situated if the employee "deals with the same supervisor and is subject to the 'same standards governing performance evaluation and discipline.'" *Kendrick*, 220 F.3d at 1232 (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)). A plaintiff may show pretext with evidence that she was "treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Id.* at 1230. Defendant asserts that Dr. Berrizbeitia "cannot identify a similarly-situated faculty member whom CMU treated differently . . . after that faculty member had similar student complaints lodged against them." Mot. at 9. Defendant's own witness identified one.

Instructor Kaui Ward, a male faculty member in the same department, supervised by the same department head, evaluated under the same system, during the same period, generated a "pattern" of student complaints that he was "demeaning or condescending." Ex. 2, Driskell Dep. 135:8–136:18, 138:18–23. Complaints about how a professor treats students are the very category of conduct invoked against Dr. Berrizbeitia. Yet Mr. Ward received discussion, professional development, peer observation with "nice feedback," and a documented plan "to work toward improving his evaluations." *Id.* 135:20–136:9, 138:19–21. Dr. Berrizbeitia received a termination letter. Where an employer answers comparable complaints against a male employee

with coaching and against a Hispanic woman with immediate discharge, a jury may find pretext. *Kendrick*, 220 F.3d at 1230.

The pattern extends further. Professor Rick Ott, a white male, stapled McDonald's employment applications to students' failing exams, an episode retold in the department, including by Dr. Driskell, as a "joking" anecdote. Ott admits it, was never disciplined, and remains employed. Ex. 2, Driskell Dep. 144:4–145:9; Ex. 1, Berrizbeitia Dep. 82:4–83:14. Professor Markus Reitenbach married a former student and communicates bluntly with students, without counseling. Ex. 1, Berrizbeitia Dep. 68:11–25, 84:9–86:24. Professor Megan Wendler keeps students' phone numbers and announced she would host students at her home; Dr. Driskell recalls no counseling and has never counseled any faculty member about boundaries. Ex. 1, Berrizbeitia Dep. 69:17–70:13; Ex. 2, Driskell Dep. 142:8–19, 143:19–23. Whether these employees engaged in conduct of "comparable seriousness" is a question for the jury. Tellingly, asked why policies were applied disproportionately to Dr. Berrizbeitia and not to similarly situated white male colleagues, CMU answered that it "does not have factual information to respond to this Interrogatory." Ex. 6, Def.'s Disc. Resps., Interrog. No. 12. An employer that professes to lack factual information about the uniformity of its enforcement cannot obtain summary judgment on the premise that it was uniform.

Defendant's reliance on *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106 (10th Cir. 2007), for a supposed lack of "nexus" misses the point twice over. The comparator evidence above is not about "printing or babysitting needs," Mot. at 8–9; it concerns

the very subject matter of the termination. And the printing and childcare episodes are probative for a different reason: they show the same supervisor singling out the only Hispanic woman in the group for conduct freely tolerated in others. Ex. 2, Driskell Dep. 147:2–5, 149:4–13.

### C. The termination rested on stale, previously resolved, and false allegations — and on an after-the-fact hunt for justifications.

The complaints CMU invokes concern conduct from 2020–2022. The evaluations Dr. Berrizbeitia allegedly sought help "identifying" were, by Dr. Driskell's own account, the spring 2022 evaluations, conduct addressed on the 2022 annual evaluation through a written "development plan," followed by documented improvement. Ex. 2, Driskell Dep. 114:22–116:14, 119:25–120:6, 106:11–17. Two of the three complainants had left CMU in December 2022 and May 2023. ECF Nos. 38-4 ¶ 3, 38-5 ¶ 3. And when Dr. Berrizbeitia herself reported the underlying falling-out in 2022, the response was a verbal instruction with which she complied. Ex. 1, Berrizbeitia Dep. 54:10–56:15; Ex. 2, Driskell Dep. 126:12–20, 172:24–173:6. An employer that knows of and tolerates conduct, addresses it with minor guidance, documents improvement, and then abruptly invokes the same conduct to terminate on the eve of tenure invites the inference that the stated reason is not the real one. See *Plotke*, 405 F.3d at 1103–05; *Smothers*, 740 F.3d at 541–44.

Worse, the record contains direct evidence that CMU went looking for justifications after the outcome was chosen. Dr. Berrizbeitia testified that Dr. Driskell emailed the VPAA that she could "no longer support [Dr. Berrizbeitia] for tenure," despite the complaints containing nothing materially new, and said she was

"going to try to find things that were FERPA-like violations to . . . support more of a case against me." Ex. 1, Berrizbeitia Dep. 73:14–74:13. That testimony no longer stands alone. On July 31, 2024, under the subject line "documents and next steps for AB," Dr. Driskell wrote:

> I have gone through the statements submitted by current and former students to extract details that relate to policy violations. I have also gone through my notes from meetings and interactions with Ana and with students about Ana and typed them and included those as well. Next I will go through student evaluation comments to extract any that may indicate policy violations.

Ex. 8, CMU_0439 (filed under restriction).

Every verb describes a search for grounds, not an inquiry into facts. Dr. Driskell did not summarize what the statements said; she "extract[ed] details that relate to policy violations." She did not consult her notes; she "typed them" and "include[d]" them in the package she was assembling for the VPAA. And she committed to a further pass through the course evaluations, material she had already reviewed in 2022, addressed through a written development plan, and documented improvement on. Ex. 2, Driskell Dep. 114:22–116:14, 119:25–120:6, 106:11–17. Nothing in those comments changed between 2022 and July 31, 2024; what changed was the purpose for which they were read. A jury may find that a supervisor who returns to closed material to extract "policy violations" is not investigating but building a case.

That is difficult to reconcile with Dr. Driskell's sworn testimony that her "first instinct" was coaching and that tenure "was our goal." Ex. 2, Driskell Dep. 173:11–17, 107:8–18, 139:20–21. In writing, within the same weeks, she was cataloguing

"policy violations" for the VPAA, converting her private notes into evidence, and planning interviews with the three complainants and none with the professor. Both accounts cannot be true, and it is not this Court's role at summary judgment to choose between them. *Tolan*, 572 U.S. at 656–57; *Reeves*, 530 U.S. at 150–51.

Consistent with that hunt, President Marshall told Dr. Berrizbeitia at the August 8th meeting, which she recorded, that there had been complaints "as far back as COVID" and referenced "FERPA-type violations," while refusing to provide details. Ex. 1, Berrizbeitia Dep. 100:23–101:15. Dr. Berrizbeitia denies any such violation. *Id.* 101:19–25. When an employer's asserted grounds include ones it cannot substantiate, and the evidence shows a contemporaneous search for post hoc support, a jury may disbelieve the entire explanation. *Jaramillo*, 427 F.3d at 1310; *Reeves*, 530 U.S. at 147–48.

The factual premises of the termination are also genuinely disputed. Dr. Berrizbeitia denies that she attempted to identify the authors of anonymous evaluations or confronted any student; denies any inappropriate text exchange with a transitioning student; and denies, "[a] hundred percent," that she expressed ill wishes about a student contracting COVID, a remark actually made by complainant Sponheim, as Dr. Driskell knew from another student's complaint. Ex. 1, Berrizbeitia Dep. 102:1–103:4, 103:12–104:7. The purportedly damning "comments about sexuality and gender identity" were, on her testimony, a philosophical conversation with a student whose transition she did not then know about. Ex. 7, Berrizbeitia Dep. 142:1–23. And the three written complaints, Exhibits C-2, D-2, and E-2, which the

Motion cites, were never filed with the Court, ECF Nos. 38-3, 38-4, 38-5, leaving CMU's characterizations untested. Where the accuracy of the accusations is disputed and the employer made no effort to verify them or hear the accused, the "honest belief" doctrine cannot carry summary judgment. *Smothers*, 740 F.3d at 543–44; see *Plotke*, 405 F.3d at 1103–05 ("[A] multitude of suspicious explanations may itself suggest that the employer's investigatory process was so questionable that any application of the 'honest belief' rule is inappropriate.").

CMU's own records contradict Marshall's asserted rationale that Dr. Berrizbeitia posed "a clear and present risk to the University in terms of future student experiences in [her] courses." Marshall Decl. ¶ 13. The students actually enrolled in her courses that final semester rated them 4.29, 4.52, 4.41, 5.00, and 4.58 on a five-point scale. Ex. 4, CMU_0001–0010. Those Spring 2024 evaluations were in CMU's possession when it terminated her. The dispositive question is not whether CMU's reasons were "wise, fair or correct," but "whether it honestly believed those reasons and acted in good faith upon those beliefs." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1170 (10th Cir. 2007). That is a question of state of mind, and CMU's own records put its answer in genuine doubt. *Reeves*, 530 U.S. at 147–48.

CMU's explanations have also shifted. The Notice of Dismissal recited four grounds, including "[n]eglect of duty" and "[v]iolation of local, state or federal laws or regulations," without identifying any law violated. ECF No. 38-7. Yet when asked under oath to "[s]tate what reasons . . . led to the termination," CMU described only "unprofessional and inappropriate conduct," "violation of the students' personal

boundaries," and "violations of student privacy" — no neglect of duty, and no violation of law. Ex. 6, Def.'s Disc. Resps., Interrog. No. 2. The FERPA theory that now purports to supply the "violation of laws" ground first appeared in CMU's December 22, 2025 discovery responses, sixteen months after the termination, exactly as Dr. Driskell had forecast. *Id.* at 8–9 (second Interrog. No. 11); Ex. 1, Berrizbeitia Dep. 73:14–74:13. And asked to produce "the FERPA complaint that was filed," CMU could identify none. Ex. 6, Def.'s Disc. Resps., RFP No. 4. The belated emergence of new justifications is itself evidence of pretext. See *Plotke*, 405 F.3d at 1104–05; *Jaramillo*, 427 F.3d at 1310 (where a plaintiff casts substantial doubt on several of the employer's proffered reasons, a jury could reasonably find the employer lacks credibility).

**D. President Marshall's decision is tainted by subordinate bias.**

Finally, even accepting that President Marshall harbored no animus of his own, CMU remains liable under the cat's-paw doctrine if a biased subordinate's actions proximately caused the termination. *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011); *Singh v. Cordle*, 936 F.3d 1022, 1038–39 (10th Cir. 2019); *EEOC v. BCI Coca-Cola*, 450 F.3d at 484–88; see *Byrnes v. St. Catherine Hosp.*, 158 F.4th 1107, 1114 (10th Cir. 2025) (reversing summary judgment on a cat's-paw theory). Marshall "rel[ied] upon the recommendations of leaders," Marshall Decl. ¶ 12, and reviewed only the complaints and texts as packaged and "highlighted" by Dr. Driskell, Ex. 2, Driskell Dep. 171:22–172:6. Exhibit 8 is that packaging in progress: Dr. Driskell chose which statements to "extract," which "details" qualified as "policy violations,"

supplied her own typed notes as evidence, and set the evidence-gathering agenda, all before anyone had heard from Dr. Berrizbeitia. Ex. 8, CMU_0439–40. She is also the supervisor who criticized culturally rooted aspects of Dr. Berrizbeitia's self-presentation, withdrew tenure support the moment complaints arrived, and volunteered to hunt for "FERPA-like violations." Ex. 1, Berrizbeitia Dep. 80:1–81:21, 73:14–74:13. Where a decisionmaker relies uncritically on facts supplied by a biased subordinate, that bias is the proximate cause of the employment action, *Singh*, 936 F.3d at 1038, and "simply conducting an independent investigation does not automatically immunize an employer from liability under the cat's-paw theory," *id.* at 1039. Under *Staub*, a biased subordinate's report "may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." 562 U.S. at 421. Marshall made no such determination: he never spoke with Dr. Berrizbeitia or with Dr. Driskell, Ex. 2, Driskell Dep. 170:16–23; Marshall Decl. ¶ 12, and reviewed only what Dr. Driskell selected. *Cf. Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514–17 (10th Cir. 2015) (causal chain broken where an independent panel reviewed the employee's entire disciplinary history and interviewed him). Whether Marshall's review was independent is a jury question. See *BCI Coca-Cola*, 450 F.3d at 488.

**CONCLUSION**

Viewing the record in the light most favorable to Dr. Berrizbeitia, a reasonable jury could find that CMU's explanations are unworthy of belief and that she was

terminated because of her race and sex in violation of Title VII. Plaintiff respectfully requests that the Court deny the Motion.

**AI Certification:** Pursuant to Section C.2 of the Court's Standing Order for Civil Cases, undersigned counsel certifies that portions of this filing were drafted with the assistance of generative artificial intelligence, and that all language, factual assertions, and citations, including every citation to the record and to legal authority, have been personally reviewed by undersigned counsel for accuracy, and that all legal citations are to actual, non-fictitious cases or cited authority.

Respectfully submitted this 28th day of August 2026.

/s/ Joseph P. Sanchez
Joseph P. Sanchez, #20975
RAGAB LAW FIRM, P.C.
700 Seventeenth St., Suite 900
Denver, CO 80202
Telephone: (303) 557-2011
Email: joseph@ragablawfirm.com
*Counsel for Plaintiff Ana Berrizbeitia*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of August 2026, a true and correct copy of the foregoing PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT was filed and served via CM/ECF upon all counsel of record, including:

Natalie Powell, Esq.
Kerry J. Ferrell, Esq.
Colorado Attorney General's Office
1300 Broadway, 10th Floor
Denver, Colorado 80203
*Counsel for Defendant*

/s/ *Tammy Anderson*
Tammy Anderson | Senior Paralegal
Ragab Law Firm, P.C.